**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

ZACCHERY BELVAL,

     **Plaintiff,**

v.

ELECTRIC BOAT CORPORATION,

     **Defendant.**

**Civil Action No. 3:23-cv-01387**

**LOCAL RULE 56(a)(1)**
**STATEMENT OF UNDISPUTED MATERIALS FACTS[1]**

Defendant Electric Boat Corporation ("Electric Boat") submits this Local Rule 56(a)(1) Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

**ELECTRIC BOAT HIRES PLAINTIFF**

1.     Electric Boat hired Plaintiff Zacchery Belval ("Plaintiff") in November 2017 as a Mechanical Designer at Electric Boat's Groton, Connecticut shipyard facility. (Exhibit ("Ex.") 1, Excerpts from Transcript of Plaintiff's November 20, 2024 and November 25, 2024 Depositions, p. 35; Ex. 2, Plaintiff's Job Requisition.)

     **Affirmed: Context, Electric Boat interviewed and extended a letter for intent to hire in late 2015, due to their slow response to Government Requests and the backlog at the FBI it took nearly a year and a half to solidify a first start date. In that time Plaintiff got a mandatory seniority raise due to time elapsed.**

2.     At the time of hire, Plaintiff and his peers worked on-site full-time. (Ex. 1, pp. 36-37.)

     **Affirmed: Context, Plaintiff made medical conditions overwhelmingly clear at time of hiring.**

---

[1]     As they must be at this state of the proceedings, these facts are set forth in the light most favorable to Plaintiff. *See Natofsky v. City of New York,* 921 F.3d 337, 344 (2d Cir. 2019). Electric Boat reserves its right to contest these facts in future proceedings as necessary, including in the event that this matter proceeds to trial.

3.      Electric Boat requires new hires to complete a pre-employment medical examination and, during this process, Plaintiff disclosed his medical history to Electric Boat's Occupational Health Center ("OHC"), also referred to as the "yard hospital."  (Ex. 3, Affidavit of Kate Olsen, ¶ 2; Ex. 4, Plaintiff's Medical Record from OHC, EB 000054.)

**Affirmed: Including Complete and Full Medical Records.**

4.      As a Mechanical Designer, Plaintiff was responsible for designing sketches and layouts to support Electric Boat's manufacture, assembly, and testing of the nuclear submarines it builds for the U.S. Navy.  (Ex. 5, Affidavit of Nicholas Leonard, ¶ 2.)

**Affirmed: This does not reflect the Definition of Mechanical Designer in the UAW/MDA bylaw handbook, there are minor technical differences.**

5.      As a federal defense contractor, Electric Boat has access to classified information.  (Ex. 3, ¶ 3.)

**Affirmed**

6.      In his role at Electric Boat, Plaintiff was required to obtain a "Secret" security clearance from the U.S. government.  (Ex. 1 at p. 34; Ex. 3, ¶ 4.)

**Contention: This was a requirement of the assigned work, not necessarily a requirement for every work assignment that was available to Plaintiff's credentials.**

7.      As evidenced by the need for this security clearance, poor work performance in this context is not just inconvenient – it can have catastrophic results, including undermining national defense, putting lives at risk, and impacting the effectiveness of military operations.  (Ex. 3, ¶ 5; Ex. 5, ¶ 2.)

**Contention: Plaintiff was regularly assured that Design did not hold ultimate responsibility for the documents which they worked on, and that their supervisor and engineering staff were the ultimate duty holders in the safety of the concerned components. This was said by**

**Paul Demers, Mark Homand, and senior Union members any time Plaintiff brought to light an issue concerning design safety. Also, in documents which Defense has so far refused to release, there is a record of Plaintiff writing a letter, email, or stand-alone statement to attach to design documents as to bring up a safety issue which management was resistant to addressing. Though Demers and Homand are on record in Union proceedings saying this years earlier, the sentiment was repeated by all of Plaintiff's management and senior members. To assert that National Security depended wholly on Plaintiff's work would either justify a significant pay increase to Plaintiff, or an outright falsity. All documents are signed by multiple parties, and as the lowest ranking in authority Plaintiff would reasonably expect to have the lowest portion of duty.**

8.      In or around March 2020, due to the COVID-19 pandemic, Electric Boat allowed many of its employees (including Plaintiff) to work from home full-time.  (Ex. 1, pp. 12-13.)

**Affirmed**

**PLAINTIFF'S PERFORMANCE ISSUES BEGIN**

9.      From approximately March 2020 until April 2021, while Plaintiff continued to work from home on a full-time basis, Plaintiff's supervisor, Wilson Bolanos, identified several issues with Plaintiff's performance.  This exceeded what would be expected for Plaintiff's role and experience.  (Ex. 6, Affidavit of Wilson Bolanos, ¶ 2.)

**Contention: Plaintiff received an award for outstanding performance in March of 2020, and the claims of poor work quality began immediately after this ADA claim. Plaintiff also went to great lengths to assemble a living document of standards (as they were not in a Style Manual/DPD or other such document) and instructions on work quality were mainly given in terse, short annotations on previous work, or by verbal directions. As a record of all emails from this time period would show, Plaintiff practically begged on a daily basis for**

3

**clear, consistent, written instructions. The One Note Document, which was mainly assembled by Plaintiff and Dominik Squalis (a Senior Drafter in the group) was Plaintiff's earnest attempt to correct these issues. And the One Note Document was later submitted by Wilson Bolanos to the DPD (internal digital Style Guide group and documentation) for suggestions as additions to the process concerning the work assigned to Plaintiff. (Page 267 Evidence Document)**

10.    In particular, Mr. Bolanos noted numerous errors concerning Plaintiff's designs and drawings which were requiring additional rounds of internal review and correction.  (Ex. 6, ¶ 3.)

**Contention:**

**Errors were transient and amorphous, "finding errors" is a common tactic of Electric Boat management for when they want to manufacture an excuse to dismiss someone without cause. Please reference testimony of Mike Marion. (Page 265 Evidence Document)**

11.    Mr. Bolanos met with Plaintiff several times in 2021 to discuss the poor quality of his work in detail.  (Ex. 6, ¶ 4; Ex. 7, "Poor Quality of Work" Notes.)

**Affirmed: At the behest of Leonard.**

12.    On March 29, 2021, as Plaintiff's work quality still had not improved, Mr. Bolanos issued him a Verbal Warning.  (Ex. 1, p. 190; Ex. 8, 3/29/21 Verbal Warning.)

**Affirmed: At the behest of Leonard, and after submitting letter to be allowed to Work From Home despite pressures to come back in in-person at what is now the height of the Pandemic. (Page 283 Evidence Document)**

**PLAINTIFF REFUSES TO RETURN TO ON-SITE WORK AND REQUESTS ACCOMMODATION**

13.    In April 2021, after Plaintiff was working from home for approximately one year, Mr. Bolanos reached out to him about returning to on-site work.  (Ex. 1, pp. 39 & 49; Ex. 6, ¶ 5.)

**Affirmed (Page 309 of Evidence Document)**

4

14. Mr. Bolanos knew that James Giddings, Director of Waterfront Operations, would soon be issuing a directive for all employees in their department to return to on-site work due to improved COVID-19 statistics. (Ex. 6, ¶ 6.)

**Unknown: This information is not in Plaintiffs memory. (Page 309 of Evidence Document) Also irrelevant, the directives of any Management do not override the Medical Accommodations set by Physicians without express demonstration of business need, and interactive process completion.**

15. Plaintiff informed Mr. Bolanos that he preferred to continue working remotely due to his complex medical history. (Ex. 6, ¶ 7.)

**Contention: Plaintiff also cited continuing developments of medical issues and asked that Defense Human Resources and Yard Hospital speak with Attorney Gosline and Danielle Mallory APRN because his health was failing him. To the point where on more than one occasion a hostile phone call from Human Resources (suspected K Olsen but never introduced themselves on the phone.) was responded to with simply a "Please talk to Attorney Gosline."**

16. Mr. Bolanos told him, in that case, he should contact the OHC to discuss accommodations. (Ex. 6, ¶ 8.)

**Unknown: This seems to contradict in context claims from defense. If Plaintiff had already hired an Attorney and named a designated physician as points of contact, why would Plaintiff again contact the Yard Hospital? Wouldn't any reasonable interactive process include the representation assigned by Plaintiff due to their inability to properly respond due to their ongoing health issues?**

17. On April 21, 2021, Mr. Bolanos contacted the OHC to let them know that Plaintiff would be reaching out. (Ex. 6, ¶ 9; Ex. 9, 4/21/21 Allan Dierman Note.)

**Affirmed: Letters and Phone calls were made to Dr. Robert Hurley and his staff concerning the condition of Plaintiff's health. As well as on record communication with Union Representative and Yard Hospital. (Pages 3- 9, 127, 130, 138, 257, 284, 289 Evidence Document)**

18.     Mr. Bolanos told the OHC that Plaintiff had been working remotely since the start of the pandemic, the only medical note supporting continued remote work that Mr. Bolanos had was dated October 13, 2020, the department was returning to on-site work, and Plaintiff had been having performance issues.  (Ex. 6, ¶ 10; Ex. 9; Ex. 10, 10/13/20 Medical Note from Danielle Mallory.)

**Contention: Law requires only that a single letter from a physician be presented. There is no further requirements from the ADA to provide any more information other than a qualifying Clinical Expert's Orders.   (EEOC Guidelines, Requesting Reasonable Accommodations, Section 8C https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada )**

19.     On the same day, Allan Dierman, DNP, FNP-C from the OHC contacted Plaintiff to get more information concerning his request to work from home full-time.  (Ex. 4, EB 000054;[2] Ex. 9)

**Contention: Numerous email were exchanged between Plaintiff and Mr. Dierman which are germane to this claim and have not been released by Defense as they have claimed that they contain "trade secrets".**

20.     Plaintiff told Mr. Dierman that he was at a higher risk of mortality if he were to contract COVID-19.  (Ex. 4, EB 000054; Ex. 9.)

**Affirmed**

21.     On May 17, 2021, Plaintiff provided a note from his treating provider, Danielle Mallory, APRN, but did not provide the OHC with the necessary consent form which would allow the OHC to

---

[2]     Plaintiff testified that this April 21, 2021 entry by Mr. Dierman was accurate.  (Ex. 1, pp. 47-49.)

contact Ms. Mallory.   (Ex. 4, EB 000054-EB 000055; Ex. 11, 5/17/21 Medical Note from Danielle Mallory).

> **Contention: Consent is not necessary under the ADA requirements, and Plaintiff had provided Attorney Gosline as contact and designated counsel if there were any additional questions. Defense's failure to work with Attorney Gosline is not reflective of Plaintiff's cooperation or lack thereof. Defense also had full permission to contact Mallory APRN and Fairchild APRN to ask questions, as noted by her letter and the release forms.**

22.     By her note, Ms. Mallory explained that Plaintiff has a complicated medical history and was more vulnerable than most to infections.  (Ex. 11.)  Ms. Mallory added that Plaintiff was completing a series of immunizations and should continue to work from home until that was complete, which she estimated would occur within ten to twelve weeks.  (Ex. 1, pp. 50 & 52-53; Ex. 11.)[3]

> **Affirmed: Ms. Mallory also noted that there were other medical issues developing and that if there were any questions they should inquire with her office. Ms. Mallory had written release from Plaintiff to speak at will on issues concerning his health. But had not released the ENTIRE MEDICAL RECORD as Defense insisted was the ONLY method they would accept as further information.**

## PLAINTIFF'S PERFORMANCE ISSUES PERSIST AND EMPLOYEES ARE DIRECTED BACK TO ON-SITE WORK

23.     In May 2021, even after receiving a Verbal Warning, Plaintiff's performance issues continued and Mr. Bolanos again met with Plaintiff to discuss it.  (Ex. 1, p. 193; Ex. 6, ¶ 11.)

---

[3]     Due to Plaintiff's delay in completing the consent form, Mr. Dierman was not able to speak with Ms. Mallory about her medical note until June 23, 2021.  (Ex. 4, EB 000054-EB 000055.)  *See infra* at Paragraphs 29-40 for the conclusion of this part of the interactive process.

**Affirmed: Though these warnings were dubious and would be difficult to uphold under scrutiny as compared to other members of the team, were their performance as a whole taken into consideration, and select examples not relied on.**

24.     On May 28, 2021, Director Giddings issued the anticipated Memorandum to Plaintiff's department (and others) directing that, due to decreased COVID infections and increased vaccinations, the default work location should be on-site, with remote work being the exception as needed.  (Ex. 1, pp. 59-60 & 183; Ex. 12, 5/28/21 Return to Work Memorandum).

**Unknown: This is information that Plaintiff was not aware of, was likely hospitalized at this time.**

25.     In response, all of Plaintiff's peers returned to on-site work on at least a hybrid schedule.[4] (Ex. 6, ¶ 12.).

**Affirmed: This is stated by Electric Boat Management, but rumors confer that many groups continued to work at home full time even up until this day. Just not the group that Leonard was now placed in charge of. Particularly, Engineering groups, and the Design group lead by Steve Rengigas.**

26.     On June 2, 2021, due to ongoing poor work quality, Mr. Bolanos issued Plaintiff a Written Warning.  (Ex. 1, p. 194; Ex. 13, 6/2/21 Written Warning.)

**Affirmed**

27.     Plaintiff never offered his medical conditions as a reason for his poor performance.  (Ex. 6, ¶ 13.)

**Contention: Given that Defense has highly qualified medical experts on staff and had full availability of both Attorney Gosline, Amy Stephenson, and Danielle Mallory APRN,**

---

[4]     Plaintiff testified that he was not aware of whether other Electric Boat employees were permitted to continue working from home on a full-time basis.  (Ex. 1, pp. 47-48.)

**Whitney Fairchild APRN, and eventually Plaintiff's entire current medical record, as well as the medical records which they acquired via hiring examination. There is no reason that a qualified clinical expert would not have been able to surmise that an anxiety induced breakdown and pending heart failure might have an effect on performance. Additionally, Plaintiff communicated this to Stephenson in the following text message, "Monday, June 21, 2021 · 6:45 AM (Page 3 – 9 Evidence Document)**

28.    At all times relevant to the Complaint, the only accommodation Plaintiff requested of Electric Boat was to work from home full-time.  (Ex. 1, p. 32.)

**Affirmed: Plaintiff and Clinical team could conceive of no other accommodation which would fulfill the needs without a greater financial burden. As the only other reasoned accommodation would be to have a private office in Hartford Connecticut. An expense which surely outweighs the cost of a single computer terminal. Especially considering that Defense had already accommodated for nearly two and a half years and has essentially unlimited resources per government grants and other government contracts, and access to world class experts in any conceivable domain at their pleasure. Plaintiff was also working through Union Representative Amy Stephenson, who he assumed was representing his interests as the MDA contract articulated.**

**ELECTRIC BOAT CONTINUES TO ENGAGE IN THE INTERACTIVE DIALOGUE**

29.    On June 23, 2021, after obtaining consent from Plaintiff, Mr. Dierman from the OHC spoke to Ms. Mallory.  (Ex. 4, EB 000056.)[5]

**Affirmed: At no point did Mr. Dierman not have permission to speak to Mallory APRN, as demonstrated by numerous letters.**

---

[5]    Plaintiff testified that this June 23, 2021 entry in the medical record by Mr. Dierman concerned a conversation that he was not "privy to" and "is one of those conversations I would not have a great memory of" but acknowledged that the record "sounds reasonable."  (Ex. 1, pp. 51-52.)

30.    This type of call, in follow up to a medical note, is routine practice for Electric Boat's OHC and ensures that Electric Boat has all the necessary information to engage in a comprehensive interactive dialogue.  (Ex. 14, Affidavit of Dr. Robert Hurley, ¶ 2.)

**Contention: Electric Boat has at no point ever published, or indicated a way to obtain their written, standardized and management duty assigning procedure for accommodation. Most employees Plaintiff had previously asked to believe that such a document does not exist, because Defense Management is in the habit of not accommodating anyone and using Legal intimidation to dissuade people from pursuing their accommodation needs.**

31.    In this conversation, Mr. Dierman learned that it was Ms. Mallory's opinion that Plaintiff would be able to return to on-site work on August 9, 2021.  (Ex. 1, pp. 52-53; Ex. 4, EB 000056.)

**Contention: At the time of claiming this, Ms. Mallory was accurate, within days of making that statement, Plaintiff condition declined more, and this was no longer possible due to hospitalization and other medical issues which had developed. Plaintiff even text messaged Amy Stephenson, the Union Representative the following in preamble to Mr. Dierman's phone call, "Wednesday, June 23, 2021 · 2:02 PM Stephenson or any other Defendant Staff as to whether they were willing to discuss specifics. Two additional text messages were sent to Amy Stephenson in response to emails which are contained in the Electric Boat internal system. Showing that Plaintiff not only did send some kind of release to other medical staff, but that it was confirmed that it was received. (Pages 3-9 Evidence Document)**

**PLAINTIFF DOES NOT RETURN TO WORK ON-SITE**

32.    Plaintiff continued to work from home but Electric Boat anticipated that Plaintiff would return to the worksite (on at least a hybrid basis) in August 2021.  (Ex. 1, pp. 52-53; Ex. 4, EB 000056; Ex. 6, ¶ 14.)

**Contention: Defense *assumed* that Plaintiff would return in August and never intended to follow up with Plaintiff. If Defendant had done any follow up with any of Plaintiff expert representatives, Clinical Staff, or Attorney Gosline. They would have been easily informed of Plaintiff's continuously declining condition.**

33.    However, Plaintiff failed to return and did not communicate with Electric Boat about being unable to return at that time.  (Ex. 1, pp. 57-58.)

**Contention: Plaintiff was hospitalized or otherwise medically incapacitated at this point, had there been an accommodation plan, FMLA could have been used. But Not only was there a complete failure of Defense to begin the FMLA process, their disability insurance provider Sedgwick, refused to honor the insurance agreement. This forced Plaintiff to arrange to move in with Christian Petrone as to not be homeless, and because Plaintiff was unable to walk at this time and needed significant medical assistance.**

34.    On September 24, 2021, after Plaintiff failed to return to the worksite, Mr. Bolanos called Plaintiff to discuss his work status.  (Ex. 1, pp. 179-80; Ex. 6, ¶ 15.)  Also present for this phone meeting was Nicholas Leonard who was then employed as next in command below Mr. Bolanos, and replaced Mr. Bolanos as Plaintiff's supervisor in October 2021.  (Ex. 5, ¶ 3; Ex. 6, ¶ 16.)

**Contention: This was a managerial ambush meeting where the majority of the speech was accusations and caustic remarks about Plaintiff's character. Though Mr. Bolanos attempted to mediate and even advocated for Plaintiff at some points, the overall tone was affrontive and seen as hostility that could merit discrimination. Text messages sent to Amy Stephenson articulate one such case (Page 5 Evidence Document)**

35.    During this call, which occurred after the date by which Ms. Mallory had cleared him to return to the worksite, Mr. Wilson and Mr. Leonard discussed with Plaintiff that his ongoing performance issues were a growing problem.  (Ex. 1, pp. 179-80; Ex. 6, ¶ 17.)

11

36.     They wanted to help Plaintiff be successful in his role but felt strongly that on-site work was critical to that goal.  (Ex. 6, ¶ 18.)

**Contention: This is a bold-faced lie; management was more concerned with forcing Plaintiff to appear on site than to consider any actual causes of poor performance. Plaintiff continuously informed Bolanos about his condition, his worsening state, and how it was affecting his ability to perform on multiple occasions before this point. These are included in the emails and instant messages which Plaintiff had repeatedly requested and Subpoenaed from Defense. Mr. Bolanos was even demoted or reassigned as a form of retaliation for attempting to defend Plaintiffs accommodation needs. Mr. Bolanos was particularly compassionate because his own son has a similar medical condition to Plaintiff. Ultimately, I believe they pressured or otherwise reconstituted a statement from Mr. Bolanos which did not reflect the events. This is also why Plaintiff believes that Leonard had been moved into his current position. As he was willing to acquiesce to management pressure rather than accommodate plaintiff. This was previously stated in Plaintiff's motion to Lamine Leonard as witness, as this event makes his testimony unreliable. Last text message sent to Leonard had no response and shows lack of cooperation in accommodation. (Page 7 Evidence Document) Please note that no response was received.**

37.     They suggested to Plaintiff that he return on-site just two days a week.  (Ex. 1, pp. 179-80; Ex. 6, ¶ 19.)

**Affirmed**

38.     They also offered him a cubicle to himself and mask-wearing to reduce risk of infection and make him as comfortable as possible.  (Ex. 6, ¶ 20.)

**Contention: Defense has an antiquated and inadequate ventilation system, some of which have intake and outlets inside of light fixtures. They have an entirely open office layout in**

**their facilities, and have every building packed with as many people as possible. MDA Union Steward had advised at one point that most buildings were far beyond capacity for Fire Code. This is the reason Plaintiff attempted to Subpoena a myriad of records from the City of Groton. Which Defense made extreme efforts to undermine. Accommodation suggested here is also immaterial to the needs of Plaintiff, as proximity to Dr. Upadhyay was the primary need due to the unique expertise he possesses. In the event of an Emergency, Electric Boat Campus is nearly two hours by car from Dr. Upadhyay.**

39.    Importantly, no one ever told Plaintiff this proposed plan was required or that his failure to agree to this plan would result in any adverse employment action; rather, this was simply his supervisor's proposal for how to help him improve upon his performance and keep him working.  (Ex. 6, ¶ 21.)

**Contention: Defense offered no plan to Plaintiff which would accommodate his needs and simply offered him the standard working environment which any other person would have access to whether they needed accommodation or not. As at this point most of the staff was working multiple days of the week at home, and had schedules devised to reduce the number of people on campus so as to finally abide by the Fire Code. This is not an accommodation proposal, but was a veiled threat from Defense Management, one where Plaintiff was to infer that failure to simply accept the same conditions as every other person or they would be terminated. It is Plaintiff's opinion that there was some kind of "Monkey's Paw/Reverse Monkey's Paw" situation. Whereby the clout of Mr. Leonard, as he was intimately connected with Electric Boats internal Legal Department, and Upper Management, was being used to persuade Mr. Bolanos to remain silent on this matter. This in turn was reciprocated by Upper Management facilitating the "proposed plan" which was**

**the standard working situation for all other employees; with some situational exceptions as those other employees worked to meet Corporate Management goals.**

40.    Despite these suggestions, Plaintiff continued working from home full-time until October 2021.  (Ex. 15, Plaintiff's August 8, 2022 verified complaint filed with the Connecticut Commission on Human Rights and Opportunities, ¶¶ 7 & 11.)

**Affirmed**

## PLAINTIFF TAKES A LEAVE OF ABSENCE

41.    In October 2021, Plaintiff began an 18-month leave of absence which was approved through to April 8, 2023.  (Ex. 1, pp. 14-17, 64-66 & 68-69; Ex. 3, ¶ 6.)

**Contention: Management via both Mr. Leonard and Mr. Bolanos emails indicated that this was Plaintiff's only choice. As he was to either agree to working in person immediately or he would be terminated unless he took leave. Mr. Bolanos suggested that Plaintiff take full-time FMLA as a means to preserve his position for as long as possible in hopes that Attorney Gosline and Defense could come to an agreement that was sensible. One such Plaintiff proposed solution at this time was to take intermittent FMLA for two days a week, and to work three days a week from home while in a state of medical uncertainty. Noting that this arrangement was not intended to be indefinite but would continue for the foreseeable future. This proposal was not even given a response and was summarily ignored as a means to elevate the perspective perception of Defense. Text messages which can corroborate some of this, telling Mr. Leonard that Plaintiff would need to continue with the Work From Home accommodation, and text messages to Cecil Carter, and Zach Lemmon about why this was necessary. (Pages 3-39 Evidence Document)**

42.    After October 2021, Plaintiff never worked (on-site or otherwise) again.  (Ex. 1, p.32.)

**Affirmed**

14

43.     On January 3, 2022, Plaintiff showed up in-person at the worksite with no prior notice. (Ex. 1, p. 75; Ex. 5, ¶ 4.)

**Contention: False, Mr. Bolanos advised Plaintiff that if he didn't show up to the meeting that day in person there would be no hope of recovering his job. Plaintiff therefore at great personal risk went into the office to meet Mr. Bolanos as a means of Good Faith Cooperation, as Plaintiff had been stable for a week. Upon arrival Plaintiff was informed that he was to report to the Yard Hospital, a walk across their campus which took him nearly an hour to make due to Plaintiff's extreme low blood oxygen levels. No assistance in the form of alternative transportation was ever offered across campus, and Plaintiff had to park in the guest handicap space because there were no other handicap spaces available. Upon reaching the Yard Hospital, Plaintiff was made to wait an unknown amount of time. Whereby one of the Clinical Staff came out and told him he had to return to duty, or he would be terminated. There was no meeting, or discourse. Plaintiff left to go home immediately afterwards and was again hospitalized shortly after for excess strain to his heart. This is another complete fabrication from Defense. Plaintiff had a blood oxygen level measuring between 80-92% at this point, why would someone in that state put in so much effort without any reason or purpose? (Page 307 Evidence Document)**

44.     At that time, he was told to report to the OHC to be cleared to return to work, which is standard procedure for anyone returning to work from a medical leave at Electric Boat.  (Ex. 5, ¶ 5.)

**Contention: Plaintiff was never shown this report beforehand, there was no communication with his clinical staff that indicated that they had cleared him to go back to campus, and the decision was made without any input from Plaintiff or any of the available experts who would advocate for Plaintiff's best interests. Plaintiff did not even find this out until he was**

15

**on campus and the Clinical staff announced it to the entire waiting room as indicated in previous response. (Objection to point 43)**

45.    The OHC told him that, before he could return to work, he first needed to provide documentation from his healthcare provider indicating he was cleared to return to work and providing restrictions, if any.  (Ex. 4, EB 000057.)

**Affirmed**

46.    Plaintiff told the OHC that he had an appointment with his primary care physician the next day and would return to the OHC after that with the necessary documentation.  (Ex. 1, pp. 81-82; Ex. 4, EB 000057.)

**Affirmed, Plaintiff Attended an appointment with Mallory APRN January 4, 2022. Was seen at Urgent Care January 6, 2022, and seen at Connecticut Children's Medical Center on January 10, 2022 for a surgical procedure. Plaintiff was duly incapacitated, again please refer to professional staff provided to keep Defense apprised of Plaintiff's Condition. (Page 307 Evidence Document)**

47.    Nevertheless, Plaintiff never returned to the OHC and, rather, continued his leave of absence.  (Ex. 1, pp. 64-66, 68-69 & 81-82; Ex. 3, ¶ 7, Ex. 4, EB 000057.)

**Contention: Plaintiff was in and out of the hospital for the rest of the month and never received communication about any form of accommodation at that time. Plaintiff was also incapable of reasonable response due to Hospitalizations, and *again* Defense should have deferred to his team of professional advisors. (Page 307 Evidence Document)**

**ELECTRIC BOAT OFFERS A REASONABLE ALTERNATIVE ACCOMMODATION**

48.    When Plaintiff's 18-month leave of absence ended on April 8, 2023, Plaintiff failed to return to work.[6]  (Ex. 3, ¶ 8.)

---

[6]    Despite his failure to return, Electric Boat did not terminate him.  (Ex. 1, p. 156.)

**Contention: Plaintiff was having Surgery in March of 2023 and was incapacitated all of April. This information again would have been readily available via professionals provided. (Page 303 Evidence Document)**

49.     On April 14, 2023, Plaintiff contacted the OHC requesting to work from home full-time indefinitely due to his medical condition; this time, his reason was that Electric Boat's worksite was located too far away from his hospital.[7] (Ex. 1, p. 87; Ex. 4, EB 000058.)

**Contention: Plaintiff had always requested an accommodation for ongoing Work From Home/Remote Work as a means to secure his employment while in and out of the hospital for numerous reasons and procedures. Plaintiff did not Authorize the FMLA full time off but was forced to by Defense. Plaintiff still maintained a request for accommodation for Remote Work and intermittent FMLA while indisposed, which was conveniently ignored by Defense. Plaintiff even recalls Attorney Gosline discussing how Defense refused to work with or acknowledge him when he had tried to meet with Defense In Person on behalf of Plaintiff, but Plaintiff does not know the extent of what happened. other than Attorney Gosline implied that they refused to even speak with him. This was revealed over a phone conversation between Plaintiff and Attorney Gosline.**

50.     In response, on April 17, 2023, Kathleen "Kelly" Balantic, DNP from the OHC advised Plaintiff that supporting documentation from his healthcare provider would be needed in order to assess his accommodation request. (Ex. 1, pp. 123-25; Ex. 4, EB 000058.)

---

[7]     When Plaintiff first requested full-time work from home, his reason was the risk presented by the pandemic. *See supra* at Paragraphs 15, 20 & 22.  His reasoning in 2023, however, changed to needing to be near his medical team, which was closer to his home than Electric Boat.  (Ex. 1, p. 87; Ex. 4, EB 000058.)  Notably, prior to the pandemic, Plaintiff worked on-site on a full-time basis and he never raised any need to be near his medical team.  (Ex. 1, pp. 36-37; Ex. 4, EB 000054; Ex. 9.)  Related, Plaintiff's complex medical history has existed since birth so it was not a change in his medical status that explained his shifting reason to work from home.  (Ex. 16, Plaintiff's Answers to Defendant's Interrogatories, pp. 9-10.)

**Contention: Defense had full access to Plaintiff's medical records, and written permission to contact Mallory APRN and Fairchild APRN as they wished and refused to exercise this privilege to gain the information the wished to have.**

51.    The OHC also reached out to Plaintiff's supervisor, Mr. Leonard, to determine whether the department could accommodate Plaintiff's request to work from home full-time indefinitely.  (Ex. 4, EB 000058.)

52.    Mr. Leonard responded to the OHC that the department could not accommodate Plaintiff's request.  (Ex. 4, EB 000058.)

53.    Given the importance of Plaintiff's role to the process of building nuclear submarines, Mr. Leonard was justifiably concerned and wanted to help Plaintiff improve his performance while maintaining the highest standards for the design work central to Electric Boat's defense-based business, by bringing him back on-site for additional mentoring and coaching.  (Ex. 5, ¶ 6.)

54.    In addition, and importantly, during Plaintiff's 18-month leave of absence, there had been notable  changes and updates relating to the process and nature of the designing and drafting work with which Plaintiff would need to become familiar in order to do his job.  (Ex. 5, ¶ 7.)

55.    Accordingly, Mr. Leonard felt strongly that bringing Plaintiff back to on-site work, with the support of a mentor who could sit with and educate him, would greatly minimize the risk of errors and improve Plaintiff's performance.  (Ex. 5, ¶ 8.)

**Contention: Elements 51 through 55 are entirely fabricated to appeal to Defense's narrative, and do not reflect the attitude or demeanor with which Leonard spoke to Plaintiff at any point in his employment. Furthermore, it is again important to note that previous management Wilson Bolanos was willing to cooperate with accommodation requests and was inexplicably moved out of that role at a very convenient time for Defense's narrative. Mr. Leonard has a reputation for being disrespectful and condescending and is even on**

**record in other Court Proceeding lying to Marion and the Court. (Page 50 Evidence Document)**

56.     Consistent with its typical practice when a department does not feel it can provide an employee's requested accommodation, Electric Boat then promptly initiated its Accommodations Review Committee ("ARC") process.  (Ex. 3, ¶ 9.)

57.     The ARC is a cross functional group that includes representatives from Electric Boat's medical, human resources, and legal teams which work together with management to determine if a requested accommodation can be provided and, if not, to assess the viability of alternative accommodations.  (Ex. 3, ¶ 10.)

58.     As part of the ARC review, each individual engages in an interactive dialogue with the OHC for the purpose of better understanding the individual's medical circumstances, ability to perform the essential functions of the job, and possible accommodations.  (Ex. 3, ¶ 11.)

59.     The OHC accordingly reached out to Plaintiff on multiple occasions in April and May of 2023 to continue the interactive dialogue concerning his accommodation request.   (Ex. 1, pp. 143-145; Ex. 4, EB 000058-EB 000059.)

**Contention: Plaintiff was incapacitated after extensive surgical procedures in March of 2023, an expectation of response is unreasonable as Plaintiff was bed confined and unable to conduct himself without serious living assistance. This again is why a team of professionals was provided for Defense's convenience. (Page 303 Evidence Document)**

60.     Despite the initial conclusion that the department could not accommodate Plaintiff's request to work from home full-time indefinitely, the ARC concluded with a plan for the OHC to seek additional information from Plaintiff's healthcare provider concerning his restrictions in an effort to find a mutually agreeable accommodation.  (Ex. 3, ¶ 12.)

**Contention: Patently false as no alternative which would meet Plaintiff's medical needs was ever addressed to his Lawyer, or Medical Team. Any such proposal would have had stark commentary by the team of relevant experts serving Plaintiff's Health Interests. Plaintiff feels that this another blatant fabrication on Defense's part.**

61.     On July 7, 2023, after obtaining consent from Plaintiff, Dr. Robert Hurley, Medical Director of the OHC, spoke to Plaintiff's healthcare provider – Whitney Fairchild, APRN – concerning Plaintiff's request for an accommodation to work from home full-time indefinitely.  (Ex. 1, pp. 154, 156, 159-60; Ex. 4, EB 000061; Ex. 14, ¶ 3.)  Specifically, Dr. Hurley wanted to know if this accommodation was medically necessary or just preferred by Plaintiff.  (Ex. 14, ¶ 4.)

62.     In this conversation, Ms. Fairchild acknowledged multiple times that she was not mandating that Plaintiff work from home.  (Ex. 1, p. 160; Ex. 4, EB 000061; Ex. 14, ¶ 5.)

**Contention: There was no Case Law or other Legal precedent to Mandate Work From Home at this point in time and therefore Mandating it would put Fairchild APRN's Medical Credentials at risk. This is again Defense conflating their narrative as a fabrication of facts. A medical expert must be able to point to other similar cases to support their Mandates, and since this was a wholly new issue, no such similar cases were yet known.**

63.     Dr. Hurley requested that Ms. Fairchild provide her medical opinion in writing in order for Electric Boat to complete its evaluation of Plaintiff's request to work from home full-time indefinitely and Ms. Fairchild agreed to do so.  (Ex. 4, EB 000061; Ex. 14, ¶ 6.)

64.     On July 24, 2023, Ms. Fairchild faxed her medical opinion to Dr. Hurley.  (Ex. 14, ¶ 7; Ex. 17, 7/24/23 Medical Note from Whitney Fairchild.)

65.     Contrary to Plaintiff's request to work from home full-time indefinitely, Ms. Fairchild did *not* indicate that Plaintiff had medical need of any such restriction nor did she assert that Plaintiff could

20

not travel to Electric Boat's worksite due to a need to remain in proximity to his hospital.[8]  (Ex. 1, p. 167; Ex. 14, ¶ 8; Ex. 17.)

66.    Rather, Ms. Fairchild stated *only* that, "[i]f there are opportunities to work from home given his overall morbid condition, such should be strongly considered."  (Ex. 17.)

**Contention: Again, Fairchild cannot mandate what isn't already on record as Standard Medical Practice. Due to the breaking nature of Work From Home as accommodation, and the extreme uniqueness of Plaintiff's Medical Conditions, no reasonable Medical Expert would be able to prove indefinitely that this was a Necessary Accommodation. Therefore, she implored Defense to capitulate as it was her best Medical Opinion based on her expertise. Defense is asking that Plaintiff's Medical Staff induce risk to their Licensure for the sake of their own preferences rather than the stark evidence available to them. It is important to note that Dr. Hurley has since parted ways with Electric Boat, and has many, *many* instances of questionable medical practice on his record during his employment with Electric Boat.**

67.    Despite that Plaintiff plainly lacked medical support for his requested accommodation, the ARC determined to offer an alternative accommodation – allowing Plaintiff to work from home three days per week and on-site two days per week.  (Ex. 3, ¶ 13; Ex. 14, ¶ 8; Ex. 17.)

68.    With this entirely reasonable alternative accommodation, the ARC sought to reconcile Ms. Fairchild's recommendation to strongly consider a work from home arrangement with Mr. Leonard's need to more actively manage Plaintiff through on-site work in order to train Plaintiff in the new work he had not yet performed and to reduce the errors in Plaintiff's work product.  (Ex. 3, ¶ 14; Ex. 17.)

---

[8]    Plaintiff has also admitted he was unaware of any medical record which showed he could not drive.  (Ex. 1, p. 106.)  To the contrary, Plaintiff admitted he was working as a driver for both Uber and Lyft from at least September 2022 to March 2024.  (Ex. 1, pp. 92-93, 99-100, 106, 114-18, 167-69, 171 & 220.)

**Contention: Mr. Leonard is not a reliable source of information, and his refusal to capitulate, and his claims of poor work were purely an act of retaliation towards Plaintiff. Leonard expressed on more than one occasion (as did others in the business unit) specific distaste for disabled persons and made a habit of declaring as such. To the affect that one Gregory Main outright called Plaintiff a liar and faking his condition over a collective meeting call, and Mr. Leonard, being senior and Union Representative, did nothing to correct or dissuade Main. Bolanos, however, was outraged by this and calmly directed Main to stop speaking immediately.**

69.    At this time, all of Plaintiff's peers under Mr. Leonard's supervision were working on-site at least three days per week.  (Ex. 5, ¶ 9.)

70.    Consistent with Electric Boat's process, Dr. Hurley and Ms. Balantic from the OHC called Plaintiff to communicate the alternative accommodation but Plaintiff did not take the call or return the call.  (Ex. 3, ¶ 15; Ex. 14, ¶ 9.)

**Contention: Plaintiff is still indisposed and still had a team of experts available. (Page 302 Evidence Document)**

71.    On August 7, 2023, Ms. Balantic called Plaintiff again to discuss his request for accommodation, but Plaintiff refused to communicate with her.  (Ex. 1, p. 125; Ex. 3, ¶ 16; Ex. 16, pp. 11-12 (Plaintiff admits he "did not respond other than to refer the defendant to my attorney"); Ex. 18, 8/15/23 Return to Work Letter.)

72.    As a result, the matter was referred to Human Resources to handle.  (Ex. 3, ¶ 17.)

73.    Kate Olsen, Ethics and Compliance Manager, called Plaintiff multiple times during the week of August 7, 2023 and left a message.  (Ex. 3, ¶ 18; Ex. 18.)  Ms. Olsen intended to tell Plaintiff about the proposed alternative accommodation that could get him back to work on-site on a hybrid basis, the date by which he was expected back, and that failure to return by that date would result in Electric

22

Boat considering him to have voluntarily resigned which would result in his administrative termination from the company. (Ex. 3, ¶ 19; Ex. 18.) Plaintiff did not take the calls nor did he respond to Ms. Olsen's message. (Ex. 3, ¶ 20; Ex. 18.)

74. Accordingly, Ms. Olsen sent Plaintiff a letter with the information that she intended to communicate by phone. (Ex. 1, pp. 178-79; Ex. 3, ¶ 21; Ex. 18.)

75. Plaintiff never appeared for work on the proscribed date or offered any alternative accommodation. (Ex. 1, pp. 178-79; Ex. 3, ¶ 22.)

76. At Electric Boat, once an employee has not returned for work as required, an administrative process is engaged that leads to termination. (Ex. 3, ¶ 23.)

77. As a result, Plaintiff's employment was administratively terminated on August 21, 2023. (Ex. 3, ¶ 24.)

78. Plaintiff did not contact Electric Boat then or any time thereafter regarding any intent to return to work or proposing any alternative accommodation.[9] (Ex. 1, pp. 176-77; Ex. 3, ¶ 25.)

**Contention: Plaintiff was still indisposed, and this is why he directed Olsen to speak to Attorney Gosline, Plaintiff was incapable of coherent response. (Page 301 - 302 Evidence Document)**

**PLAINTIFF IS UNABLE TO WORK**

79. Plaintiff testified that as of July 2023, he was incapable of working; specifically, that he was falling asleep during virtual meetings and responding with "senseless babble and incoherent thoughts." (Ex. 1, pp. 170-71.)[10]

---

[9]    Plaintiff testified that his attorney informed him that the letter was being sent to him, but that Plaintiff did not receive it until after the date upon which he was expected to return to work. (Ex. 1, pp. 175-77.) Nevertheless, Plaintiff never contacted Electric Boat about it – not even to explain that he received it after the deadline to return. (Ex. 1, pp. 176-77.) Plaintiff was represented by counsel from at least August 8, 2022 until his counsel withdrew from the case on August 1, 2024. (Ex. 15, p. 1.) *See* Docket Entry No. 24.

[10]    Plaintiff offered this testimony in the context of work he was attempting to perform for another employer – not Electric Boat – during this time. (Ex. 1, pp. 170-71.)

80.     On October 13, 2023, Plaintiff's healthcare provider, Dr. Shailendra Upadhyay, MD provided a medical statement in connection with Plaintiff's application for Social Security Disability Insurance benefits which attested that Plaintiff could not: (1) work more than one hour per day, (2) stand for more than 15 minutes at a time, (3) sit for more than 60 minutes at a time, (4) frequently lift more than 5 pounds, or (5) occasionally lift more than 10 pounds.  (Ex. 19, 10/13/23 Medical Statement in Support of Plaintiff's Application for  Social Security Disability Insurance benefits.)

**Contention: These statements are true at the time of being written, the entire point of this case is that Plaintiff was attempting to overcome these restrictions so as not to become a burden the State. And to retain any capacity to be gainfully employed as to support themselves. As disability accommodation practice is currently, the disabled are either removed from society as second class citizens by relying on Social Security, or they must meet every demand of the employer. There is no intermediate which allows the disabled to conduct their life as any other citizen would. Remote Work and Work From Home would allow extreme flexibility and therefore forge new grounds for this necessary intermediate. Pursuit of Happiness is enshrined in our Constitutional Ethos, and the ability to work and receive due rewards is a significant part of that pursuit. Defense is using the existence of Entitlements such as Social Security as a means to dispose of the disabled from the workforce entirely, thereby forcing the Tax Payer to shoulder the entire burden and deprive the individual of the benefits of profitable work.**

Respectfully Submitted,

24

DEFENDANT,
ELECTRIC BOAT CORPORATION,

By Its Attorneys,

*/s/ Danielle Jurema Lederman*
Tracy Thomas Boland (ct30355)
Danielle Jurema Lederman (ct31613)
BOWDITCH & DEWEY, LLP
101 Federal Street, Suite 1405
Boston, MA  02110
Telephone:  617-757-6526
Facsimile:  508-929-3099
E-mail:  tboland@bowditch.com
         dlederman@bowditch.com

Date:  October 6, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2025, a true and accurate copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Danielle Jurema Lederman*
Danielle Jurema Lederman

25

**Summary of Retort Narrative:**

Nicholas Leonard is the kind of person who would be the advisor to the Emperor in the story "The Emperor's New Robes/Clothes". He believes that his nepotistic position, clout and friends in high places in the company will always protect him from his ill begotten actions. He used his position as Charge Person to cover up his incompetence, by changing the standard of work so fast that no one, including myself, could keep up with the changes. In response, I created a living standards document in the form of a OneNote Document as to track his changes. When it became clear that the rapidity and unpredictability of those changes was effecting not only the quality of my work, but the quality of the product overall, he assigned the OneNote Document to Dominic Squallis and found a way to have him promoted to Checker as to cover up Leonard's mistakes. Then, when Wilson Bolanos assigned me to do a Total Product Quality Assessment, and using the Preto Method, a well-established statistical method to measure Product Quality.

It showed that the entire group had a rote pass rate of around 40%. And that some members of the group had single digit pass rates, and mine was average. I had worked in Quality and Compliance for Flight Safety Components Manufacturing on and off since 2011 before working for Electric Boat and knew that anything less than 80% pass rate almost always signals a process and procedure problem. No one intentionally fails their assigned task 60% of the time by choice or chance. Also, statistical analysis showed no numeric aberrations which would indicate cooking of the numbers. At the time I was enrolled for a BS in Mathematics and reached out to some of my professors to make sure my technique and approach were sufficient. They provided academic sources only and were not exposed to even the scenario for this data. It was asked as a pure question of curiosity.  Leonard became more aggressive about finding ways to undermine my competence.

Around the same time, the psychological stress this induced started to take a toll on my body, my blood pressure began to rise uncontrollably, and I had panic attacks that were debilitating. Knowing that at some point I could be incapacitated by this, I hired Attorney Gosline and made sure to seek as much professional support as I could muster. My hope was that Attorney Gosline would be able to negotiate a reasonable accommodation on the grounds of my medical needs, and that this would work to preserve my employment as I went through treatment and recovery. I have had this heart condition my entire life, and I knew there would be a point where I would be unable to respond reasonably before I was fully recovered. And therefore, needed to do everything in my power to provide for that potentiality.

Both Leonard and Electric Boat Management used my illness as an opportunity to try to remove me from the position because this was a matter of convenience to them. This is not a unique claim; there are no less than twenty-eight other similar cases over the past decade which have made it to court alone. And countless others which are dropped due to the lawfare which Electric Boat regularly stoops. The reputation even among the non-employees around the Groton and New London area for the corruption and discrimination of Electric Boat is great enough to be the talk of coffee shops and casual conversations with strangers.

The act of reassigning/demoting Bolanos at exactly the time my accommodation would have needed to have been approved was convenient for Electric Boat. The less gracious part of me would speculate that this was collusive and intentional, and that demoting Bolanos was an act of retaliation against both myself and him as a means to punish him for supporting my

26

accommodation needs. See, Mr. Bolanos has a son with a condition similar to mine, and felt compelled to defend my needs because he didn't want to see his own son abused in a similar manner. I believe Bolanos believed that by standing up for me, he would be making a better future for his own child. Before I was assigned to Work From Home for nearly two and a half years, I had won a service award for my work on the very same project. I personally pointed out NAVSEA and other safety and legal issues in the design and personally brought more than one potential Sub-Safe issue to the attention of Lead Engineers. This contradictory performance evaluation suggests a suspicious reasoning alone, combined with all the other elements I have described it almost meets the letter of the law description for Retaliation Discrimination.

This doesn't mean that I was beyond errors, or that my work was implacable in every way. I'll admit that I made occasional transcription errors, or minor errors of style or grammar. I am in fact human, despite what my anatomical record seems to suggest. I will also admit that as my base line O2 level became lower and lower, and my heart, lung, liver, digestive and anxiety issues became more grave, I made more careless errors. A lack of oxygen to the brain will inhibit clear thought like that and knowing that this would happen beforehand I had made every arrangement I could reasonably conceive of to ameliorate this risk. I kept frantic notes on directions, I did everything in writing so that I could go back and re-read instructions, I presented my work to my mentor Cecil Carter before turning it in for Final Check by Leonard. I did above and beyond my due diligence to ensure that safety and law were adhered to, to ensure the safety of the Navy Members whose life would rely in part on my work.

I even went out of my way to request less demanding work, or work that was lower risk while I recovered as to assuage this risk. A request that Wilson Bolanos attempted to fulfill, I even discussed with Bolanos at one point foregoing my contractual Seniority Raise to compensate for the reduced caliper of my work due to my health conditions. I do not know what became of this discussion after I was hospitalized and left the negotiations to the expert advice of Attorney Gosline. If the court were to order the release of ALL Instant Messages, Emails, and Work I produced from March of 2020 until dismissal. The court would find that this was easily supported by such evidence, no matter how proprietary Electric Boat claims such vital evidence should or would be.

And just as I stated in other places, I am not sure if Leonard was a willing participant in this debauchery or if he was unduly pressured to do so. And therefore, have given him the benefit of the doubt by inducing a "Reversed Monkey's Paw" Scenario, in reference to the famed "Monkey's Paw" argument often cited in these cases. Whereby Leonard inadvertently acted as an agent of the Company Management to enact this discrimination on their behalf as a means to protect his own job. As he had just got married, bought a new house, a new car, and was planning to expand his family. And any reasonable person would do anything they perceived they needed to do to protect their income and their family. And one of the reasons I filed a Lamine to dismiss Leonard from the proceedings is that I would not want the company to retaliate again and dismiss him in the case where I was found to have a ruling in my favor. As I already saw how they treated Bolanos when he tried to overtly help me, I can only imagine what would happen to the rest of my prior business team if Electric Boat lost this case.

27

I have bided my time and attempted in good faith to find any alternative solutions possible because I was wresting with the ethical implications of my need vs the needs of the people who work for Electric Boat vs the Disabled Community. I pushed hard for retraction of funds under the Rehabilitation Act, not because I wished to entirely defund the Submarine Production force. But because I knew that such drastic defunding would force the Navy to entirely restructure Electric Boat, examine their Management with exceptional scrutiny, and cause the average employee to have their job transferred rather than lost. This division of risk for the employees, and the Navy's need to conserve their expertise as a matter of National Security would protect the average employee from the worst of unemployment. While at the same time forcing the Government to confront the wanton corruption and discrimination within Electric Boat.

If the court were to request the internal messages of all of the Electric Boat staff, especially when their new Diversity and Inclusion Officer addressed the entire staff via video announcements. It would become starkly obvious that this is a continuous and dire issue within the company. And to furthermore support this, people such as Cecil Carter and Zach Lemmon, who I once considered good friends of mine, refuse to even acknowledge my communications. I believe that this is because their employment was somehow threatened if they talked to me. Even my Uncle Steve, who also works for Electric Boat, was terse to me when I called to ask if he were affected by this case. He denied that he was, and he has always had a terse relationship with me. So, again I am not sure if he has been influenced or if this was just a matter of ambivalence to my situation. We were never close, and I cannot speak for his mental state. But it would not surprise me to learn that Electric Boat Management made some kind of vague gesture at his employment, and he being close to retirement chose to just be quiet to conserve his own needs.

Electric Boat prides themselves on being the Silent Service, not because silence helps to maintain operational validity. But because the enforced silence about their corruption and the fear they use to induce it in their Employees is a major asset to their legal liabilities. They don't remain silent to protect the Sailors; they use the necessary secrecy as a means to hide their own incompetence and misdeeds. They cry "National Security", "Trade Secrets", and "Proprietary Information" any time someone points out an error, misstep or other trespass against morality and legality. If a person can't be silenced, they are first moved, then if necessary undermined and dismissed to prevent the truth from seeping out.

As a means to uphold my own character, I told my best friend, and now long-time roommate as much as I could about this as it was happening. We have been friends for more than twenty years, and he stands on his honor in his prior military career and on his faith to support me, without promise of payout or reward for nearly five years. Had I poor character, don't you think he would have discovered it by now? I also uphold my own character through my Degree in Ethics from American Public University, also known as American Military University. Where most of the staff and students either serve in the military or have a family member who did or does. The thousands of pages of writing I have submitted in my degree, the people I have come to befriend and respect. None of them seem to indicate that I have a major character flaw worthy of distrust or suspect of dishonesty.

Please ask yourself, which is more likely: someone who was tricked into taking advantage of a sick person to conserve their own employment. Or an undeniably ill person fighting with every breath

28

to defend themselves, their honor, and their integrity as a farce. All because I don't want my actions to hurt other people unnecessarily. How many other people respond with tact and dignity to opposing counsel from their literal death bed because they have decided to uphold an elaborate lie? Occam's Razor cuts deep here. And Hanlon's Razor screams that there must be some significant incompetence, incompetence that is clearly enough to damage National Security.

Defense has admitted on record that the cases I sighted are relevant evidence to this case via verbal admission on previous conference call with Judge Underhill. Their narrative in this document and the narrative document which they submitted simultaneously to this admit that they both believe I am disabled enough to be unable to work, and that they refused to accommodate. Meaning that they drew the conclusion that the liability for their failure to follow medical orders should be the burden of the People via Social Security dispersal.

This is the crux of the issue, instead of using the vast resources at their disposal to gainfully employ and permit the dignity of providing for one's self. They believe they ought to be able to dispose of the Plaintiff out of arbitrary convenience. That is again almost the textbook example of the meaning of discrimination. To relegate someone to a second-class citizenship, to devalue their personhood because of a poor opinion of an immutable trait. I didn't choose to be disabled, but they definitely chose to act out of malice to cause me harm because it wasn't to their taste or liking. Like a farm animal put out to pasture when they are no longer considered productive enough.

Further points of merit germane to the issues standing:

1) COLE v. UNITED STATES DEPARTMENT OF JUSTICE et al, No. 1:2021cv01049 – Document 19 (D.D.C. 2021) Navy members sue Navy over radiation poisoning from serving on an Electric Boat Submarine. Engineering managements failure to address legitimate engineering issues in favor of undermining those who brought the issues to light in some kind of managerial blackballing scheme.
2) I (Plaintiff) was considered twice for an Engineering Management position by an adjacent work group twice in the year pervious to the COVID19 Work From Home order.
3) I (Plaintiff) reported the issues and concerns originally brought to Leonard's attention to NCIS on the premises mid-discovery even though doing so could jeopardize Plaintiffs case because the safety of Military Members is my primary concern.
4) As admitted by Defense, Plaintiffs title at the time of said accusations of poor performance was Designer. Though a pedantic point, the MDA UAW bylaws indicate that the title of Designer is to focus on Design related issues, not the nomenclature and grammatical errors of non-consequential result. The details of nomenclature and style are the primary duty of Drafters and Checkers, neither of which I held as rank. My job to the letter was to safeguard against engineering errors which could cause harm to the end user, not to find every spelling error and style faux pas.

Every part I worked on I did so from the perspective that my sister, my cousins Darius, Marcus, Dakota, and David were all relying on similar work for their safety in their military service. And that ensuring the safety of the service member effected by the components I worked on were tantamount to others doing similarly for my family. I had not only a contractual obligation to focus on Form, Fit and Function over Style and Appearance. I had a moral duty to do so. Form, Fit and Function being the foundation of all valid engineering design.

These are well known and pervasive problems throughout the Military Industrial Complex. From the quality issues of Boeing to the failure to deliver on the F series Fighter Jet program from Pratt and Whitney, this is a well documented systemic quality issue across a wide spectrum of military and military adjacent engineering projects. From the failure to abide by fire code or workplace health and safety to major design flaws endangering Navy members, the twenty plus cases for failure to abide by Federal Law noted in other court documents. Electric Boat has a well established reputation for failing design and retaliation on those who point out violations. What easier way to undermine a potential whistleblower than to fire them under dubious circumstances surrounding various other legal excuses and controversy?

I don't know if the issues I brought to light were, are or would be tantamount to the Cole v US case. But the fact that every possible method to undermine my character was used to halt this case because it might possibly expose "trade secrets" is exceptionally suspicious given the circumstances. I believe that the reason Defense refused to work with any accommodations I proposed is that "Undo Burden" is a convenient excuse to dismiss me as I drew closer to evidence of such issues. And Leonard's claims of sudden poor performance are just a component of this convenience.

As my last appeal to reason, I would like to reference Attorney Leeja Miller speaking about Hannah Ardent's observations on the banality of evil. Her speech is found here: (https://m.youtube.com/watch?v=aGjaPRqxCSI) entitled "Epstein's Emails are an Indictment of the 1%" .