**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

ZACCHERY BELVAL,
    Plaintiff,

    v.

                       No. 3:23-cv-01387 (SRU)

ELECTRIC BOAT CORPORATION,
    Defendant.

## <u>ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Self-represented plaintiff, Zacchery Belval, alleges that his former employer, Electric

Boat Corporation ("Electric Boat"), refused to grant him an accommodation for his disability and

terminated his employment because of his disability. Accordingly, he brings failure-to-

accommodate and disability discrimination claims against Electric Boat under the Americans

with Disabilities Act ("ADA") and the Connecticut Fair Employment Practices Act ("CFEPA").

Compl., Doc. No. 1.

Electric Boat moves for summary judgment on all of Belval's claims. Def.'s Mot. for

Summ. J., Doc. No. 116. For the following reasons, Electric Boat's Motion for Summary

Judgment, Doc. No. 116, is **GRANTED**.

### I.      Background

Electric Boat hired Belval in November 2017 to serve full-time and on-site at Electric

Boat's Groton, Connecticut shipyard facility. Def.'s Local Rule 56(a)1 Stmt., Doc. No. 118, at

¶¶ 1-2. There is some dispute regarding the position for which Belval was initially hired.

Although Electric Boat alleges that it hired Belval as a Mechanical Designer in November 2017,

*id*. at ¶ 1, Belval claims that he was initially hired as a Senior Drafter and promoted, by

automatic advancement schedule, to the Mechanical Designer position in July 2020. Compl.,

Doc. No. 1, at ¶ 10; Pl.'s Local Rule 56(a)2 Stmt., Doc. No. 134, at ¶ 1. The duties for each

position differ slightly.  Whereas Belval claims his work "mostly involved paperwork" and "editing documents prepared by Electric Boat engineers," Compl., Doc. No. 1, at ¶ 11, Electric Boat alleges that a Mechanical Designer participates in the design of sketches and layouts in support of the company's "manufacture, assembly, and testing of [] nuclear submarines" built for the United States Navy.  Def.'s Local Rule 56(a)1 Stmt., Doc. No. 118, at ¶ 4.  Belval asserts that he was qualified for both positions because of his educational and professional experience.  Ex. A to Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Decl."), Doc. No. 134-2, at ¶ 2.

Prior to his start date, Belval was required to complete a pre-employment medical examination.  Def.'s Local Rule 56(a)1 Stmt., Doc. No. 118, at ¶ 3.  During that process, Belval disclosed his medical history to Electric Boat's Occupational Health Center ("OHC").  *Id*. Belval's medical ailments include "a complex congenital heart defect, heterotaxia (the inversion and abnormal arrangement of organs), the lack of a spleen (which seriously compromises his immune system against infections), an impaired circulatory system, and severe anxiety . . . ." Compl., Doc. No. 1, at ¶ 7.  As a result of his medical conditions, Belval is "at risk of improper diagnosis and treatment if he requires emergency medical care from unfamiliar medical providers."  *Id*. at ¶ 12.  He also claims that his medical conditions make the quarter-mile walk from the parking lot to his office "physically challenging," and that, when combined with Electric Boat's office work environment, he is at increased risk of contracting COVID-19 and other infections.  *Id*. at ¶¶ 13-15.

At the time of his hire, Belval and his peers all worked in-person at Electric Boat's Groton campus.  Def.'s Local Rule 56(a)1 Stmt., Doc. No. 118, at ¶ 2.  In the Fall of 2019, Belval requested and received an adjustment to his work schedule that allowed him to work four ten-hour days so that he could receive medical treatment one day out of every workweek.  Pl.'s

Decl., Doc. No. 134-2, at ¶ 12.  Belval's team received an award for exemplary service on or about March 2020.  *Id*. at ¶ 14.

Because of the COVID-19 pandemic, Electric Boat allowed its employees to work from home beginning in March of 2020.  Def.'s Local Rule 56(a)1 Stmt., Doc. No. 118, at ¶ 8.  Consequently, Belval worked remotely using a company-owned computer from March 2020 through October 12, 2021.  Pl.'s Decl., Doc. No. 134-2, at ¶¶ 18, 21.  Although Belval asserts that he "continued to perform all essential functions of [his] job at a level that met or exceeded expectations,"[1] *id*. at ¶ 19, Belval's supervisor, Wilson Bolanos, "identified several issues with [Belval's] performance" after March 2020 and met with Belval "several times in 2021 to discuss the poor quality of [Belval's] work in detail."  Def.'s Local Rule 56(a)1 Stmt., Doc. No. 118, at ¶¶ 9, 11.  Ultimately, Bolanos issued Belval a verbal warning on March 29, 2021 and a written warning on June 2, 2021; Belval's purported performance issues continued following those warnings.  *Id*. at ¶¶ 12, 26, 35.  Belval denies any performance issues[2] and instead claims that the negative feedback he received after March 2020 was "in retaliation" for his request to "continue working from home full-time" after Electric Boat directed its employees to return to the office.  Pl.'s Local Rule 56(a)2 Stmt., Doc. No. 134, at ¶ 9.

In or around April 2021, Bolanos communicated Electric Boat's desire for Belval to return to the office at least part-time.  Pl.'s Decl., Doc. No. 134-2, at ¶ 25; Def.'s Local Rule 56(a)1 Stmt., Doc. No. 118, at ¶ 13.  After Belval responded that he would prefer working remotely, Bolanos told him to contact Electric Boat's OHC to request an accommodation.  Def.'s

---

[1] In support of that claim, Belval notes that in March 2020 he received an award for outstanding performance and that he "was interviewed internally for advancement to an Engineering Management position on more than one occasion."  Pl.'s Decl., Doc. No. 134-2, at ¶ 19.

[2] Belval claims that Bolanos asked him to conduct formal studies of his team's performance.  The resulting studies showed that his team was generally performing poorly and that Belval "was performing roughly average among the entire group."  Pl.'s Local Rule 56(a)2 Stmt., Doc. No. 134, at ¶ 97.  He also concedes that "an anxiety induced breakdown and pending heart failure" affected his performance.  *Id*. at ¶ 103.

3

Local Rule 56(a)1 Stmt., Doc. No. 118, at ¶ 16.  On April 21, 2021, the OHC contacted Belval, who reiterated that he was at higher risk of mortality from COVID-19 and preferred to work remotely.  *Id*. at ¶ 20.  OHC also spoke with Belval's medical provider, Danielle Mallory, who recommended that Belval "continue to work from home until August 9, 2021, after which [Belval] could return to on-site work."  Def.'s Mem. of L. in Supp. of Mot. for Summ. J., Doc. No. 117, at 12-13.

Electric Boat allowed Belval to continue working virtually through August 9, 2021.  It did so even though it had instructed other employees at Belval's department that, "due to decreased COVID infections and increased vaccinations, the default work location should be on-site, with remote work being the exception as needed."  Def.'s Local Rule 56(a)1 Stmt., Doc. No. 118, at ¶ 24.  Belval did not return to in-person work after the August 9, 2021 date, perhaps because he was hospitalized for shortness of breath in or around August 2021.  Def.'s Mem. of L. in Supp. of Mot. for Summ. J., Doc. No. 117, at 13; Pl.'s Decl., Doc. No. 134-2, at ¶ 31.  It does not appear that Belval effectively communicated to Electric Boat why he needed to continue working from home once the August 9, 2021 date passed.  *See* Def.'s Mem. of L. in Supp. of Mot. for Summ. J., Doc. No. 117, at 13; *but see* Pl.'s Local Rule 56(a)2 Stmt., Doc. No. 134, at ¶ 33 (asserting that Belval made it clear to Electric Boat that his attorney was available to communicate on his behalf).  Consequently, both Bolanos and Nicholas Leonard—who replaced Bolanos as Belval's direct supervisor in October 2021—held a phone meeting with Belval on September 24, 2021.  Def.'s Local Rule 56(a)1 Stmt., Doc. No. 118, at ¶ 34.  At that meeting, Bolanos and Leonard addressed Belval's work issues, requested that Belval return to in-person work two days a week, and offered Belval a private cubicle "and mask-wearing" to make him more comfortable in the office.  *Id*. at ¶¶ 35-38.

Belval disagrees with some aspects of the above story.  For one, Belval complains that Electric Boat ignored Danielle Mallory's note and pressured him to return to work by "[c]hanging design style requirements without significant notice and singling out the work that [he] did as poor."  Pl.'s Decl., Doc. No. 134-2, at ¶ 34.  Belval also claims that he suggested several accommodations to Bolanos during their phone meetings.  Those accommodations included "assigning [Belval] to other work, transferring [Belval] to another group, or a voluntary demotion for [Belval] as to take on less pressing work with less responsibility."  *Id*. at ¶ 39.  Belval further asserts that he asked Bolanos if he could "work[] from home three twelve hour days a week and tak[e] intermittent FMLA for the remaining four hours a week," or if he could work out of a temporary office in Hartford instead of having to make the commute to Groton.  *Id*. at ¶ 40.  Belval does not believe that Electric Boat considered any of his suggestions.  *Id*.

After Belval's physician advised him not to return to in-person work due to a breathing problem Belval was experiencing, Belval took medical leave under the Family and Medical Leave Act ("FMLA") beginning in or around October 2021.  *Id*. at ¶¶ 42, 47.  Belval was not paid during his medical leave.  *Id*. at ¶ 47.  Belval's initial FMLA period ended on January 3, 2022, but because his medical provider recommended that Belval work from home due to the COVID-19 pandemic, Belval asked to work remotely full-time after his return.  *See* Compl., Doc. No. 1, at ¶¶ 24-25.  Belval claims that in response to his request, Electric Boat offered Belval the opportunity to work remotely one or two days a week.  *Id*. at ¶ 26.  Belval apparently did not accept that offer and was placed on an extended leave of absence that continued through April 10, 2023.  *Id*. at ¶ 27.  During his time on leave, Belval filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), alleging that Electric

Boat "ha[d] failed to make reasonable accommodations for [his] disability." Ex. 15 to Def.'s Local Rule 56(a)1 Stmt., Doc. No. 118-15, at 6.

When Belval's 18-month leave concluded on April 8, 2023, Belval reiterated his desire to work from home. Def.'s Mem. of L. in Supp. of Mot. for Summ. J., Doc. No. 117, at 13. Six days later, on April 14, 2023, Belval contacted the OHC and requested to work from home full-time because "Electric Boat's worksite was located too far away from his hospital." Def.'s Local Rule 56(a)1 Stmt., Doc. No. 118, at ¶ 49. After Leonard informed OHC that Belval's request to work full-time from home could not be accommodated, *id*. at ¶¶ 51-52, Electric Boat initiated an interactive process to assess the viability of alternative accommodations. *Id*. at ¶¶ 56-57. As part of that process, OHC reached out to Belval's healthcare provider, Whitney Fairchild, who informed Electric Boat by letter that, "[i]f there are opportunities to work from home given his overall morbid condition, such should be strongly considered." Def.'s Mem. of L. in Supp. of Mot. for Summ. J., Doc. No. 117, at 14.

Electric Boat ultimately offered Belval the opportunity to work from home three days a week, which is one more day per week than offered to other employees. Def.'s Local Rule 56(a)1 Stmt., Doc. No. 118, at ¶¶ 67, 69. Belval was unresponsive[3] when the OHC attempted to inform him of Electric Boat's offer. *Id*. at ¶¶ 70-71. Because Belval was repeatedly unresponsive or incommunicative, the OHC referred the matter to Electric Boat's Human Resources department. *Id*. at ¶ 72.

---

[3] At a motion hearing I held on July 14, 2026, Belval claimed that he instructed Electric Boat to speak with his attorney on his behalf, and that his attorney repeatedly attempted to communicate with Electric Boat, to no avail. Belval does not point to any evidence in the record of that, however, and he admitted in his Local Rule 56(a)2 Statement that he was unresponsive during the interactive process. Pl.'s Local Rule 56(a)2 Stmt., Doc. No. 134, at ¶¶ 70-78.

Kate Olsen, Electric Boat's Human Resources Ethics and Compliance Manager, then called Belval multiple times the week of August 7, 2023 to inform him that he needed to report to the OHC by August 21, 2023, or Electric Boat would consider him to have resigned his position. *Id*. at ¶ 73. When Belval picked up Olsen's calls, he merely told Olsen to speak to his attorney. Pl.'s Local Rule 59(a)2 Stmt., Doc. No. 134, at ¶ 89. Unable to communicate the August 21, 2023 deadline over the phone with Belval, Olsen sent a letter informing him of that deadline on August 15, 2023. Ex. 18 to Def.'s Local Rule 56(a)1 Stmt., Doc. No. 118-18, at 2. Belval claims that he did not receive that letter until after the August 21, 2023 deadline but concedes that he did not reach out to Electric Boat even after he received the letter. Belval Dep., Doc. No. 118-1, at 62:8-63:19. Because he did not appear at the OHC on August 21, 2023, Electric Boat administratively terminated him that same day. Def.'s Local Rule 56(a)1 Stmt., Doc. No. 118, at ¶¶ 75-77.

There is some dispute regarding whether Belval would have been capable of working from home, even if permitted to do so. Belval testified in his deposition that when working for another employer in July 2023, he repeatedly fell asleep during virtual meetings and responded to others with "senseless babble and incoherent thoughts." Belval Dep., Doc. No. 118-1, at 60:8-14. Belval later objected to his deposition testimony without pointing to a specific citation in record evidence. Pl.'s Local Rule 59(a) Stmt., Doc. No. 134, at ¶ 79 (citing "Affidavit"). Approximately two months after his termination, moreover, Belval submitted an application for Social Security Disability Insurance ("SSDI") benefits that included an evaluation by a physician that Belval "could not: (1) work more than one hour per day, (2) stand for more than 15 minutes at a time, (3) sit for more than 60 minutes at a time, (4) frequently lift more than 5 pounds, or (5) occasionally lift more than 10 pounds." Def.'s Local Rule 56(a)1 Stmt., Doc. No. 118, at ¶ 80.

Belval received a release of jurisdiction from the CHRO on July 28, 2023 and a right-to-sue notice from the United States Equal Employment Opportunity Commission ("EEOC") on August 4, 2023.  Compl., Doc. No. 1, at ¶ 4-5.  He filed the instant suit on October 23, 2023.

In his Complaint, Belval asserts three claims against Electric Boat.  Counts One and Four allege that Electric Boat discriminated against Belval based on his disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(b)(1), and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(b)(1), respectively.  Count Two asserts that Electric Boat failed to make reasonable accommodations in violation of the ADA, 42 U.S.C. § 12112(b)(5)(B).  There is no Count Three.  Electric Boat moves for summary judgment on all three of Belval's claims.  *See* Def's Mot. for Summ. J., Doc. No. 116.

## II.     Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).  When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party").  When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient probative evidence to

establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Regarding materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of

9

nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

### III.    Discussion

#### a.    Count Two: Failure to Provide Reasonable Accommodation

The ADA prohibits a covered entity from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Prohibited discrimination under the ADA includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee,' unless 'the accommodation would impose an undue hardship' on the employer." *Tudor v. Whitehall Cent. Sch. Dist.*, 132 F.4th 242, 246 (2d Cir. 2025) (quoting 42 U.S.C. § 12112(b)(5)(A)). A plaintiff bringing a failure to accommodate claim must show, by a preponderance of the evidence, that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) his employer refused to make a reasonable accommodation." *Id.* (cleaned up).

#### i.    Whether Belval was a qualified employee

The parties do not dispute that Electric Boat is subject to the ADA or that Belval is disabled within the meaning of the ADA. Electric Boat does, however, contest the third element of Belval's prima facie case, *i.e.*, that Belval was a qualified employee. "An employee is qualified for a position only if [he] can perform its essential functions." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 98 (2d Cir. 2009). "Although the term 'essential functions' is not defined by the ADA," *id.*, the Second Circuit has endorsed the EEOC's definition of "essential function" as "the 'fundamental' duties to be performed in the position in

question, but not functions that are merely 'marginal.'" *Tafolla v. Heilig*, 80 F.4th 111, 119 (2d Cir. 2023) (quoting 29 C.F.R. § 1630.2(n)(1)). "[A] court must give substantial deference to an employer's judgment as to whether a function is essential to the proper performance of a job." *McBride*, 583 F.3d at 98 (citations omitted). At the same time, however, a court should not "simply rely on the defendant's assertion regarding whether or not a function is essential[.]" *Martinsky v. City of Bridgeport*, 814 F. Supp. 2d 130, 146 (D. Conn. 2011), *aff'd*, 504 F. App'x 43 (2nd Cir. 2012) (citing *Price v. City of New York*, 264 F. App'x 66, 68-69 (2d Cir. 2008)).

The problem for Belval is that he, and not Electric Boat, "bears the burden of production and persuasion on the issue of whether [he] is otherwise qualified for the job in question." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 137 (2d Cir. 1995) (citations omitted). In other words, to proceed on his claim, Belval "must show that he could perform the essential functions of the [Mechanical Designer] position, with or without reasonable accommodation[.]" *Williams v. MTA Bus Co.*, 44 F.4th 115, 133 (2d Cir. 2022). To show that he was qualified to perform the duties of the Mechanical Designer position, Belval points to his academic and professional credentials at the time of his hiring. But the mere fact that Belval was qualified for the position when he was hired does not mean that he remained able—five years later—to perform the essential functions of his job. That is especially true when, as Electric Boat claims, Belval's performance diminished after March 2020.

Belval argues that he was qualified because he and his team were awarded for their performance in March 2020. He also points to performance studies that he conducted in 2021 showing that his team performed poorly and that he was an average performer on that team. Belval's March 2020 award, however, says little about his performance after the COVID-19 pandemic began. Indeed, Belval received both verbal and written warnings in mid-2021. He

11

took FMLA leave and therefore did not perform at all for about 18 months, from October 2021 until April 2023. His work performance around the time of his termination seems doubtful considering the health issues he was experiencing around the time of his termination.[4]

The record clearly indicates that Belval could not perform the essential functions of his job at the time of his termination. Belval testified in his deposition that, while working for another employer a month before Electric Boat administratively terminated his employment, he repeatedly fell asleep during meetings and responded to work colleagues with "senseless babble and incoherent thoughts." Belval Dep., Doc. No. 118-1, at 60:12-14. It is difficult to imagine how Belval could perform in his role as a Mechanical Designer in that sort of state. *See Frantti v. New York*, 850 F. App'x 17, 20 (2d Cir. 2021) (summary order) (noting that plaintiff's "incapacitation even at home" suggested that his heath was so poor that he "could not work with regularity, even with his suggested accommodations").

Moreover, although Belval submitted his application for SSDI benefits after his termination, his physician's statement that he was only able to work one hour per day indicates that he was incapable of continuing his full-time employment with Electric Boat. *See DeRosa v. National Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (quoting *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999)) (explaining that a "sworn assertion in an SSDI application that someone is 'unable to work' could negate an element of an ADA claim unless the plaintiff offers a sufficient explanation for the apparent contradiction"); *see also Curry v. Allan S. Goodman, Inc.*, 286 Conn. 390, 422 n.19 (2008) (citation omitted) (noting that "[a]fter-acquired evidence," like a physician's independent medical examination, "may be considered . . . to support or to rebut the plaintiff's assertion in a disability discrimination case

---

[4] The record does not make clear whether Belval worked at all from April 2023 through his August 2023 termination.

that he was qualified to perform the essential functions of the job with or without reasonable accommodation at the time of the adverse employment decision"). Belval may not have been "completely unable to work regardless of accommodation," *Chasse v. Computer Sciences Corp.*, 453 F. Supp. 2d 503, 518 (D. Conn. 2006) (citation omitted), but his deposition testimony and SSDI application signal that he was close to that point around the time of his termination. Moreover, it is not clear that Belval's request to work from home full-time would address his ability to perform his job.

Belval therefore does not carry his burden on the third element of his prima facie case. No reasonable jury could conclude that Belval was qualified for the Mechanical Designer position when he admitted to being incoherent a month before his termination, and when his medical provider noted in an SSDI application submitted two months after his termination that he could not work more than one hour per day.

### ii. Whether Electric Boat failed to make a reasonable accommodation

Even if Belval was qualified to perform the essential duties of his job, he must still satisfy the fourth element of his prima facie case. That element looks at whether Electric Boat refused to make a reasonable accommodation. In assessing that element, courts in the Second Circuit typically employ a burden-shifting framework.[5] That burden-shifting analysis is unnecessary, however, when "the employer has already taken (or offered) measures to accommodate the disability" and when those measures are "plainly reasonable." *Noll v. Int'l Bus. Machines Corp.*,

---

[5] Under that framework, the plaintiff carries the burden of first showing "that an accommodation exists that permits the plaintiff to perform the job's essential functions[.]" *Theilig v. United Tech Corp.*, 415 F. App'x 331, 333 (2d Cir. 2011) (summary order). The accommodation must be a reasonable one. *See Borkowski*, 63 F.3d at 138. "The reasonableness of an accommodation under the ADA involves a case-by-case inquiry which considers the effectiveness of the modification in light of the nature of the disability in question and the cost of implementing the modification." *Martinsky,* 814 F. Supp. 2d at 149 (D. Conn. 2011) (citation omitted). "Upon receiving [plaintiff's] request for accommodation, the burden shift[s] to [the defendant] to demonstrate that such accommodation [would be] unreasonable or unduly burdensome." *Laguerre v. Nat'l Grid USA*, 2022 WL 728819, at *4 (2d Cir. Mar. 11, 2022) (summary order) (citation omitted).

787 F.3d 89, 94 (2d Cir. 2015) (citations omitted).  That is because "[t]he ADA does not obligate

an employer to provide an employee with the accommodation requested; the employer need only

provide *some* reasonable accommodation." *Martinsky* 814 F. Supp. 2d at 148 (emphasis added)

(citation omitted); *see also Stoffan v. S. New England Tel. Co.*, 4 F. Supp. 3d 364, 376 (D. Conn.

2014) (citations omitted) (noting that the ADA "does not require the employer to provide every

accommodation a disabled employee may request" or "to meet the personal preferences of

disabled employees").  To determine what accommodation should be chosen, "the employer

must engage in an 'informal, interactive process' with the disabled individual 'to identify the

precise limitations resulting from the disability and potential reasonable accommodations that

could overcome those limitations.'"  *Martinsky*, 814 F. Supp. 2d at 147 (quoting *Curry*, 286

Conn. at 416).  "[T]he employer providing the accommodation has the ultimate discretion to

choose between effective accommodations" proposed in the interactive process.  *Cormier v. City

of Meriden*, 420 F. Supp. 2d 11, 20 (D. Conn. 2006) (citation omitted).

Electric Boat engaged in an interactive process with Belval and offered him the

opportunity to work virtually three days a week.  In making that offer, Electric Boat considered

the opinion of Belval's medical provider, Whitney Fairchild, who recommended, but did not

mandate, that Belval be given the opportunity to work remotely.  Therefore, Electric Boat's

"offered accommodation was not contrary to the stated opinions of [Belval's] own" medical

provider, who merely said that Belval should have the opportunity to work remotely when

possible.  *Bielski v. Green*, 674 F. Supp. 2d 414, 425 (W.D.N.Y. 2009).  Because Belval does not

provide evidence that he could only perform his job duties if permitted to work full-time from

home, Electric Boat's offer appears "sufficient to meet" Belval's "job-related needs."  *Robinson*

*v. Roosevelt Union Free Sch. Dist.*, 2012 WL 1980410, at *9 (E.D.N.Y. May 31, 2012) (citation omitted).

"Although '[t]he reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder,' it is equally true that 'in a case such as this, in which the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.'" *Gallagher v. Town of Fairfield*, 2015 WL 3453342, at *9 (D. Conn. May 29, 2015) (quoting *Noll*, 787 F.3d at 94); *see also Bielski*, 674 F. Supp. 2d at 424 (collecting cases) ("[I]f the employer has proposed a reasonable accommodation, the employee cannot insist on some other particular accommodation, even if the employee's proposed accommodation is also reasonable."). In the absence of any evidence that Belval needed to work virtually more than three days a week, I conclude that Electric Boat's proposed accommodation was plainly reasonable. *See Cormier*, 420 F. Supp. at 21 (granting summary judgment when plaintiff failed to offer evidence showing that offered accommodation was unreasonable). Summary judgment in favor of Electric Boat is therefore granted on Count Two. *See Gronne v. Apple Bank For Savings*, 1 F. App'x 64, 67 (2d Cir. 2001) (summary order) (citations omitted) (affirming summary judgment for employer when employer's offered accommodation was plainly reasonable).

Even if the accommodation offered by Electric Boat was not plainly reasonable, Belval would still fail to satisfy the fourth requirement of his failure-to-accommodate claim because he was responsible for a breakdown in the interactive process. "The Second Circuit has 'recognized that, where a breakdown in interactive process was manifestly the employee's fault, a failure-to-accommodate claim might be frivolous.'" *Bury v. Consumer Reps., Inc.*, 819 F. Supp. 3d 272,

15

284-85 (S.D.N.Y. 2026) (quoting *Tafolla*, 80 F.4th at 122).  In this case, Belval repeatedly failed to communicate with the OHC.  He did not pick up multiple phone calls, and when he did pick up, he told the OHC to contact his attorney and refused to hear OHC's proposed accommodation.  The OHC had so much difficulty communicating with Belval that it resorted to communicating with him by letter.  That letter notified Belval of the deadline by which he needed to appear at the OHC.  Although Belval claims that he did not receive that letter until after the deadline to appear had passed, the fact that he was unresponsive before the letter's mailing and failed to even contact the OHC after receiving the letter indicates that he was responsible for the breakdown in the interactive process.  Summary judgment is thus also proper on Count Two because of Belval's failure to engage in the interactive process.  *See, e.g.*, *Zito v. Donahoe*, 915 F. Supp. 2d 440, 447-48 (S.D.N.Y. 2012) (granting summary judgment when plaintiff refused to comply with requests from his employer during the interactive process).

For this reason, too, I grant summary judgment to Electric Boat on Count Two of Belval's Complaint.

### b.  Counts One and Four: Disability Discrimination

Belval asserts in Counts One and Four that Electric Boat discriminated against him based on his disability in violation of the ADA, 42 U.S.C. § 12112(b)(1), and the CFEPA, Conn. Gen. Stat. §46a-60(b)(1), respectively.  Belval does not specify in Counts One and Four what exact action by Electric Boat constitutes disability discrimination, although he does raise Electric Boat's alleged failure to accommodate in his CFEPA claim.

Courts employ the *McDonnell Douglas* burden-shifting framework used in Title VII cases to assess employment discrimination claims brought under the ADA or the CFEPA. *Mancini v. Accredo Health Grp., Inc.*, 411 F. Supp. 3d 243, 255 (D. Conn. 2019); *Tomick v. United Parcel Service, Inc.*, 157 Conn. App. 312, 325-26 (2015), *aff'd*, 324 Conn. 470 (2016)

16

(collecting cases). That framework requires first that a plaintiff establish a prima facie case of disability discrimination. To do so under the ADA, a plaintiff must show that:

> (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.

*Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). The prima facie case for a CFEPA discrimination claim is essentially the same, with "[t]he only relevant difference" being how to "defin[e] physical disability." *Hopkins v. New Eng. Health Care Emps. Welfare Fund*, 985 F. Supp. 2d 240, 256 (D. Conn. 2013). The plaintiff's burden in establishing the elements of the prima facie case is "not onerous." *Ben-Levy v. Bloomberg, L.P.*, 518 F. App'x 17, 19 (2d Cir. 2013) (summary order) (citation omitted).

Electric Boat does not contest that it is subject to the ADA and the CFEPA or that Belval is disabled within the meaning of both statutes. Instead, it argues that Belval fails to satisfy the third and fourth elements of his prima facie case. The third element here is identical to the third element of a plaintiff's prima facie case for a failure-to-accommodate claim. I therefore reiterate my conclusion above that no reasonable jury could conclude that Belval is qualified to perform the essential functions of his job, considering his deposition testimony and the medical evaluation incorporated in his SSDI application.

Belval also fails to satisfy the fourth element of his prima facie case. The fourth element requires that the plaintiff "point to evidence showing that his disability was the 'but-for' cause" of the adverse employment action. *Mancini*, 411 F. Supp. 3d at 251 (citation omitted). An adverse employment action includes "a termination of employment[.]" *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019). Although Belval does not explicitly state the specific conduct that he complains about in Counts One and Four of his complaint, I assume for purposes

17

of my analysis that Belval in Counts One and Four complains about his job termination.  After all, Belval requests in the request-for-relief section of his complaint that I "reinstat[e] him to the position, seniority, and salary he would have obtained but for the defendant's unlawful conduct[.]"  Compl., Doc. No. 1, at 9.

Belval does not provide any evidence that the company terminated him because of his disability.  Indeed, the record is clear that Electric Boat terminated him for non-discriminatory reasons.  When Belval worked from home during the COVID-19 pandemic, he received verbal and written warnings for his poor work product.  Even if one believes Belval's assertion that his poor performance evaluations were in retaliation for his accommodation request, that does not change the fact that Belval repeatedly refused to engage in the interactive process with Electric Boat, and that he did not appear at the OHC by the deadline set by Electric Boat.  Although Belval claims he did not receive the letter informing him of that deadline until after the deadline had passed, he did not contact Electric Boat even after receiving the letter.  Instead, he filed a lawsuit.  Belval was therefore fired not only because his performance worsened after he began working from home, but because he failed to: (1) comply with Electric Boat's policy mandating some onsite work, (2) fully engage in the interactive process, and (3) appear at the OHC by Electric Boat's final deadline.  Belval was given multiple opportunities to keep his job, but his refusal to cooperate with Electric Boat gave Electric Boat a valid reason to terminate his employment.  In the absence of any evidence that Belval needed to work remotely, no reasonable jury could conclude that Belval was terminated because of his disability.

It is also relevant that Electric Boat knew of Belval's various medical issues when it hired him in 2018 and that it kept him employed for five years knowing that he was disabled.  This is not a case where Belval was fired soon after disclosing his disability.  *See Mancini*, 411 F. Supp.

3d at 251 (highlighting how the plaintiff was fired less than two weeks after her medical emergency). It is also not a case where Electric Boat failed to accommodate Belval's medical needs. After all, during the COVID-19 pandemic, Electric Boat allowed Belval to continue working from home and to take medical leave for more than a year. When Belval returned from his leave of absence, Electric Boat then offered Belval the opportunity to work from home three days a week.

Because no reasonable jury could conclude that Belval was qualified to perform the essential functions of his job at the time of his termination or that he was terminated because of his disability, I grant summary judgment to Electric Boat on Counts One and Four of Belval's Complaint.

## IV.    Conclusion

For the foregoing reasons, Electric Boat's Motion for Summary Judgment, Doc. No. 116, is **GRANTED**.

The Clerk is instructed to enter judgment and close this case.

**SO ORDERED** at Bridgeport, Connecticut this 21st day of July 2026.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge